## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
**ACTIFIO, INC.,**                              )
                                                )
       **Plaintiff,**   )
                                                )
       **v.**          )
                                                )     **Civil Action No. 14-13247-DJC**
**DELPHIX CORP.,**                              )
                                                )
       **Defendants.**   )
_____         )


## MEMORANDUM AND ORDER

**CASPER, J.**                                          **December 11, 2015**

## I.      Introduction

Plaintiff Actifio, Inc. ("Actifio") alleges that Defendant Delphix Corp. ("Delphix") infringes certain claims of U.S. Patent Nos. 8,299,944 ("'9944 patent"), 8,788,769 ("'769 patent") and 8,904,126 ("'126 patent") (collectively, the "Patents-in-Suit"). The parties now seek construction of five disputed claim terms. After extensive briefing and a Markman hearing, the Court's claim construction follows.

## II.     Patents-in-Suit

This lawsuit involves patents addressing virtual data management, storage and backup. D. 67-1 ('9944 patent), 67-2 ('769 patent), 67-3 ('126 patent); see Actifio, Inc. v. Delphix Corp., No. 14-cv-13247-DJC, 2015 WL 1243164, at *4 (D. Mass. Mar. 17, 2015). Actifio alleges that Delphix's "Agile Data Platform" products and services infringe one or more of the claims of the Patents-in-Suit. D. 67 ¶¶ 18, 22-23, 35-36, 41-42. The Patents-in-Suit share similar specifications and incorporate each other by reference. '9944 patent, 1:16-23; '769 patent, 1:15-18, 1:30-33; '126 patent, 1:16-19, 36-38. All the Patents-in-Suit were filed on November 16,

2010.  D. 67-1 at 1; D. 67-2 at 1; D. 67-3 at 1.  The '9944 patent issued on October 30, 2012, D. 67 ¶ 15, the '769 patent issued on July 22, 2014, id. ¶ 16, and the '126 patent issued on December 2, 2014, id. ¶ 17.

## III.    Procedural History

Actifio instituted this action on August 6, 2014.  D. 1.  On August 22, 2014, Delphix moved to dismiss, stay or transfer the action to the Northern District of California.  D. 7.  The Court denied that motion, D. 54, and a history of the litigation between the parties is outlined in the Court's Order on that motion.  See Actifio, 2015 WL 1243164, at **2-3.  Actifio filed an assented-to amended complaint on April 14, 2015.  D. 67.  After claim construction briefing, the Court held a Markman hearing on November 19, 2015 and took the matter under advisement.  D. 110.  Later that day, without leave of the Court, Delphix filed a "Supplemental Claim Construction Submission" which included the arguments it presented at the Markman hearing.  D. 111.  Actifio filed a reply and requested Delphix's submission be stricken, D. 112, and Delphix opposed, D. 115.  Considering the parties have had an opportunity to respond to each other's post-hearing filings, the Court considers all of the submissions here and denies Actifio's motion to strike the supplemental submission filed by Delphix.

## IV.    Standard of Review

As established by the Supreme Court, construction of disputed claim terms is a question of law for the Court.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  This Court must construe "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  In doing so, the Court must look to "the words of the claims themselves, the remainder of the specification, the prosecution

history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)) (internal quotation marks omitted).

## A.     The Claims

Claim construction begins with the words of the claims themselves where "the claims of a patent define the invention to which the patentee is entitled the right to exclude." Id. at 1312 (quoting Innova, 381 F.3d at 1115) (internal quotation marks omitted). Claims "are generally given their ordinary and customary meaning" and can "provide substantial guidance as to the meaning of particular claim terms." Id. at 1312, 1314 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)) (internal quotation marks omitted). "[T]he context in which a term is used in the asserted claim can be highly instructive." Id. at 1314. A claim itself may provide the means for construing a term where, for instance, the claim term is consistently used throughout the patent. Id. As such, "the meaning of a term in one claim is likely the meaning of that same term in another." Abbott GmbH & Co., KG v. Centocor Ortho Biotech, Inc., No. 09-cv-11340-FDS, 2011 WL 948403, at *3 (D. Mass. Mar. 15, 2011) (citing Phillips, 415 F.3d at 1314). Notably, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Phillips, 415 F.3d at 1315.

## B.     The Specification

Claims are not to be read alone, but "are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims." Id. (citation omitted). "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." Id. (quoting Vitronics, 90 F.3d at 1582) (internal quotation mark omitted). The

specification, as the patentee's description of the invention, defines "the scope and outer boundary" of the claims and, thus, "claims cannot be of broader scope than the invention that is set forth in the specification." On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1338-40 (Fed. Cir. 2006). In looking to the specification in interpreting the meaning of a claim, the Court must be careful not to "import[ ] limitations from the specification into the claim." Phillips, 415 F.3d at 1323. This standard may "be a difficult one to apply in practice," id., but "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction," id. at 1316 (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

### C.   The Prosecution History

After looking to the claims themselves and the specification, "a court should also consider the patent's prosecution history, if it is in evidence." Id. at 1317 (citation and internal quotation marks omitted). The prosecution history, as evidence of how the inventor understood the patent, "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. (citing Vitronics, 90 F.3d at 1582-83). Because the prosecution history "often lacks [] clarity" it is "less useful for claim construction purposes" and is given less weight than the claims and the specification. Id.

### D.   Extrinsic Evidence

Finally, the Court may also consider extrinsic sources which can aid in educating the Court "regarding the field of the invention" and in determining "what a person of ordinary skill in the art would understand claim terms to mean." Id. at 1319. Dictionaries and treatises often assist courts in understanding the underlying technology and "in determining the meaning of

particular terminology to those of skill in the art of the invention." Id. at 1318.  In general,

extrinsic evidence is considered "less reliable than the patent and its prosecution history in

determining how to read claim terms," id., and thus "is less significant than the intrinsic record in

determining the legally operative meaning of claim language," id. at 1317 (citations and internal

quotation marks omitted).

## V.    Construction of Disputed Claims

The parties dispute the meaning of the following five terms and the Court resolves these

disputes as discussed below.

### A.    '9944 patent

*1.    "non-lossy encoding technique"*

| Term | Actifio's Proposed Construction | Delphix's Proposed Construction |
|---|---|---|
| non-lossy encoding technique | algorithm to create an encoded representation of data that allows the original data to be completely reconstructed | data compression algorithm to create an encoded representation of data that allows the original data to be completely reconstructed from the encoded data |

The parties dispute the meaning of the term "non-lossy encoding technique" in claim 1 of

the '9944 patent.  '9944 patent, 34:24-27; D. 97 at 12; D. 98 at 10.  Claim 1 states, in relevant

part:

> A method of storing deduplicated images in which a portion of the image is stored in
> encoded form directly in a hash table, the method comprising . . . receiving content to be
> included in the deduplicated image of the data object; generating a new hash structure for
> the received content; determining if the received content may be encoded using a
> predefined non-lossy encoding technique and in which the encoded value would fit
> within the field for containing a hash signature; if so, placing the encoding in the field of
> the new hash structure instead of placing a hash signature for the received content in the
> field, and marking the new hash structure to indicate that the field contains encoded
> content for the deduplicated image, so that the received content is not stored since the
> received content can be derived from the encoding . . . .

'9944 patent, 34:6-8, 21-34.  The term is used when describing the storage of a data chunk in the field of a content "handle" otherwise reserved for a "hash" identifier[1],  id., 27:55-28:9, where each unique data chunk is stored only once and associated with a specific handle, D. 98 at 6; D. 97 at 4-5.  A data object, such as a text file, is constructed using data chunks as building blocks. D. 98 at 6.  While both parties agree that the term, at the very least, refers to an algorithm potentially applied to a data chunk, they dispute whether the algorithm (1) is a data compression algorithm and (2) requires that the original data be decoded from the encoded data itself, rather than from some other external data.  D. 97 at 9; D. 98 at 10.

As to the first aspect of the dispute, Delphix urges the Court to restrict the term to a data compression algorithm because of the term's inclusion of "non-lossy" in describing the "encoding technique."  D. 98 at 10; D. 101 at 7-8.  Delphix's construction would limit the scope of claim 1 to a method that determines if a compression algorithm can be applied to a data chunk such that the compressed data chunk can be stored in the content handle itself.  This would exclude determining if an encryption or conversion algorithm, for example, can also be applied to the data chunk to be stored.  Such a limitation, however, is not supported by the claim language, specification or extrinsic evidence.  Notably, the claim language does not reference data compression and the disputed term is not otherwise defined.  Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) (describing how a patentee must explicitly redefine a term; otherwise, the plain and ordinary meaning of the term controls). Based on the parties' submissions, "encoding," standing alone, is understood to mean "the process by which one representation of information is translated into a different representation of

---

[1] A mathematical function creates a unique hash value—an identifier—based on a data chunk, such that the function would yield the same hash value for two identical data chunks.  D. 97 at 7; D. 98 at 6.

the same information."  D. 97 at 13; <u>see</u> D. 98 at 12; D. 101 at 6.  Likewise, "non-lossy" or "lossless"—as opposed to "lossy"—is understood to describe the preservation of all the original information.  D. 101 at 7.  Put together here, the plain and ordinary meaning of a "non-lossy encoding technique" is properly understood as a translation process that preserves the original information, but does not necessarily compress such information.  As noted by Delphix and its expert, data encryption is such a process and it "meet[s] Actifio's construction."  D. 98 at 12; <u>see</u> D. 102 at 7.  That is, data encryption is understood as a non-lossy encoding technique because it is a "class of encoding algorithms that create[s] an encoded representation of data that allows the original data to be completely reconstructed."  D. 98 at 12.  While the specification discusses "lossless [non-lossy] data compression" (brackets added) and "compression," it does so in regards to data storage generally, such as in storing data to a storage pool or persistent storage, '994 patent, 4:38-40, 52-54; 11:62-64; 27:24-31, 40-45, but not in regards to the storage of data in a field of the content handle itself.  In light of this distinction, the Court cannot deem the use of "non-lossy" as limiting the term solely to data compression algorithms.  <u>See, e.g.</u>, <u>Thorner</u>, 669 F.3d at 1367-68 (refusing to recognize that an applicant redefined a broad term to mean a more specific term where the specific term is also used and would otherwise be unnecessary).

To be fair, the single embodiment in the specification, as an example, mentions the use of "run-length encoding (RLE)" compression in storing data in the content handle.  '9944 patent, 27:63-28:4.  As discussed by Delphix, such an embodiment might be the most practical one where the typical hash field size of the content handle is so small that an uncompressed data chunk would never fit.  D. 101 at 5.  It is well established, however, that an embodiment itself cannot limit the otherwise broad language of a claim.  <u>See</u> <u>Thorner</u>, 669 F.3d at 1366 (noting that a limitation in an embodiment is not enough to constitute disavowal of a claim's otherwise broad

scope).  Notably, the claim and specification do not explicitly limit the field size, which could be set large enough to fit an uncompressed (or encrypted) data chunk.  See '9944 patent, 27:59-64; 34:12-27.  Likewise, the size of a data chunk is not limited and, if set small enough, an uncompressed (or encrypted) data chunk could fit in the field.  See id., 25:61-65; 34:9-20.  A larger field size to accommodate uncompressed data chunks, or smaller uncompressed data chunks to fit in the field, might not be the most efficient embodiment, but are nonetheless covered by the plain meaning of the claim.  In other words, Delphix has not "shown that [its] construction must be adopted in order to avoid inoperability."  See Atlas IP, LLC v. St. Jude Med., Inc., 804 F.3d 1185, 1189-90 (Fed. Cir. 2015).  Accordingly, "non-lossy encoding technique" in claim 1 cannot be said to refer solely to data compression algorithms and the Court rejects Delphix's limitation.

As to the second aspect of the dispute, Delphix proposes the construction of the term "non-lossy encoding technique" to mean an algorithm that encodes data such that the data can be completely reconstructed from the encoded data itself.  D. 98 at 13-14; D. 101 at 9-10.  In contrast, Actifio argues that such a construction is an inappropriate limitation because the use of "external inputs" can be used to reconstruct the data that was encoded.  D. 97 at 14-15; D. 102 at 9.  Claim 1 describes determining if content (a data chunk) can be encoded using a non-lossy encoding technique and, if so, determining if that encoded content fits within the field of the content handle otherwise reserved for a hash.  '9944 patent, 34:24-27.  If the encoded content fits, it is placed within the hash field and marked to indicate that the field contains the content itself "so that the received content . . . can be derived from the encoding."  Id., 34:28-34.  Staying true to the language of claim 1, accord Phillips, 415 F.3d at 1316, and based on the plain meaning of the terms as discussed above, Delphix's construction is appropriate because of the

use of "non-lossy."  If "non-lossy" means that the original data is preserved in its entirety, the term properly describes an algorithm that encodes the original data such that it "can be derived from the encoding," '9944 patent, 34:32-35—that is, reconstructed from the encoded data itself. Otherwise, the algorithm would not be encoding the data in a "non-lossy" form.

While Actifio urges the Court to broaden the scope of the term "non-lossy encoding technique" to encompass the creation of encoded data that can be reconstructed from some other external inputs, D. 97 at 14; D. 102 at 9, no such inputs, aside from "the encoding" itself are mentioned or inferred in the claim or specification, '9944 patent, 34:34-35.  Actifio also argues that Delphix's construction renders claim 4 superfluous and forecloses delta compression, an embodiment disclosed in the specification.   D. 97 at 15; D. 102 at 9-10.   From Actifio's perspective, Delphix's construction of claim 1 equates the storage of data in the hash field "so that the received content . . . can be derived from the encoding," id., 34:32-34; D. 97 at 12; D. 102 at 9-10, with claim 4 that addresses "subsequently reconstituting the content from the encoded content," '9944 patent, 34:45-46.  Delphix correctly points out, however, that claim 1 addresses the output of the "non-lossy encoding technique," the encoded content. D. 101 at 10-11.  Claim 4, in contrast, describes what happens with the encoded content from claim 1, in that it is "subsequently" reconstituted.  This would include building a data object from the encoded content (data chunks) as pieces of the object, as well as the use of delta compression.  '9944 patent, 28:15-25; see D. 101 at 10-11.  As described by Actifio, delta compression only stores changed content (data chunks), D. 102 at 5, and, depending on the circumstances, that changed content (as well as the original content) would first be encoded using a "non-lossy encoding technique" and then a new version of the data object could be built by "subsequently reconstituting" the original and changed encoded content, D. 101 at 10-11.

At oral argument, Actifio emphasized that, at minimum, a decoding algorithm must be applied to the encoded content to access the original data and for delta compression to operate correctly.  See Markman Hearing Transcript at 39-40.  That is, the decoding algorithm is the external input required to reconstruct the encoded content.  See id.  As Delphix pointed out, claim 1 states that "the received content can be derived from the encoded data," '9944 patent, 34:32-34, and the word "derived" implies that some operation is performed on the encoded content to access the original data.  See Hr'g Tr. at 57.  That is, a decoding algorithm is not an external input to the encoded data, but rather an operation applied to the encoded data to access the original data it contains.  Delphix's construction does not read out the use of a decoding algorithm necessary for delta compression to work.  Accordingly, the second part of Delphix's construction is true to the scope of claim 1 and does not render claim 4 superfluous.  See, e.g., World Class Tech. Corp. v. Ormco Corp., 769 F.3d 1120, 1125-26 (Fed. Cir. 2014) (recognizing that claim differentiation is not implicated where a construction does not give different claims the same scope).

   2.  *"encoded value"*

| Term | Actifio's Proposed Construction | Delphix's Proposed Construction |
|---|---|---|
| encoded value | the result of applying the non-lossy encoding technique | the result of applying the non-lossy encoding technique to the received content |

The parties also dispute the meaning of "encoded value" in claim 1, '9944 patent, 34:23-27; D. 97 at 15; D. 98 at 13, which is used in the same sentence of the '9944 patent as "non-lossy encoding technique," discussed above.  At first blush, the parties agree that an "encoded value" is the output or result of applying the "non-lossy encoding technique," but they appear to disagree as to what input the encoding technique is applied.  Id.  However, in its reply brief, Actifio agrees that "[t]his language requires the encoding to be applied to 'the received

content,'" but urges the Court to reject Delphix's construction as "unnecessary and redundant" because "the plain language of the claim already includes [Delphix's proposed] limitation."  D. 102 at 11.  The Court recognizes that the input from which an "encoded value" is created may be unclear where claim 1 specifies "received content" as the subject of the disclosed processes, but "encoded value" otherwise appears with little context.  '9944 patent, 34:21-27 ("*receiving content* to be included in the deduplicated image . . . generating a new hash structure for the *received content* . . . determining if the *received content* may be encoded . . . in which the encoded value [of the received content] would fit within the field for containing the hash signature") (emphasis and brackets added).  Considering Actifio agrees with the substance of Delphix's construction, but opposes its adoption, and to the extent the scope of the term is otherwise unclear in regards to the input, the Court adopts Delphix's construction.  See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008) (recognizing under Markman that district courts are to resolve the parties' dispute where it goes to "not the *meaning* of the words themselves, but the *scope* that should be encompassed by [the] claim language") (emphasis in the original)).

**B.**    **'769 Patent**

1.    "*identifying the existence of a prior point-in-time image of the application data in a second set of a plurality of point-in-time images simultaneously stored at the destination storage pool for a time state prior to the specified restore time-state*"

| Term | Actifio's Proposed Construction | Delphix's Proposed Construction |
|---|---|---|
| identifying the existence of a prior point-in-time image of the application data in a second set of a plurality of point-in-time images simultaneously stored at the destination storage pool for a time state prior to the | No construction necessary; plain and ordinary meaning | finding from two or more point-in-time copies of the application data in the destination storage pool one that is before the specified restoration time |

| specified restore time-state | | |
|---|---|---|

The parties dispute whether construction is necessary of a term in claim 1 of the '769 patent addressing a portion of a data restoration operation. '769 patent, 34:35-40. Delphix urges the Court to adopt its purportedly simpler construction because, left alone, the term would otherwise confuse the jury. D. 98 at 17-18.

As discussed by Actifio, the only terms that may be considered "technical" are "storage pool" (subject to an agreed upon construction, D. 97, Appx. A) and "point-in-time image" (stated in the claim as "representing the entire application data at a back-up time," '769 patent, 33:64-66). D. 97 at 16. As such, the Court does not need to clarify these terms further. See Epistar Corp. v. Int'l Trade Comm'n, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (recognizing the "heavy presumption that claim terms carry their full ordinary and customary meaning"). Just because a party may not agree with a word or phrase used in the disputed term, that does not make the term technical, ambiguous or confusing to a jury, requiring construction. See O2 Micro, 521 F.3d at 1361 (discussing how district courts are to resolve disputes over the scope of a claim). Delphix specifically takes issue with the use of "identifying" versus "finding," D. 98 at 17, but to the extent both parties use the words synonymously, id. ("[t]o identify the existence of something is to find it"); D. 97 at 7 ("[t]he storage system synchronizes the data in the two storage pools by finding a common point-in-time image"), the plain and ordinary meaning of "identifying" makes construction unnecessary. Similarly, the plain and ordinary meaning of "a set of a plurality" also controls where Delphix concedes that it cannot be "genuinely dispute[d]" that "a set of a plurality" means "two or more." D. 98 at 18.

Delphix further argues that construction is necessary because the term "simultaneously stored" may be misunderstood to mean that each of the point-in-time images were stored at the

same time, rather than stored at different times but kept in data storage at the same time.  D. 101 at 13.  Read in the context of the entire claim, claim 1 discusses how point-in-time images represent application data at different back-up times.  Thus, all point-in-time images cannot be "simultaneously stored" at the same point in time or they would not reflect changes in the application data at different times.  See '769 patent, 33:56:67.  They would not be back-ups, but mere copies of the same data at a certain point in time.

Fundamentally, Delphix does not dispute the scope of the term, but merely the words used.  As Delphix notes, its "constructions do not read any limitations into the claim from the specification . . . they merely clarify for the jury what the claim terms means."  D. 101 at 13.  As recognized by courts in this district, "the Court is not required to provide additional language construing a claim if its ordinary meaning can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation."  Keurig, Inc. v. JBR, Inc., No. 11-cv-11941-FDS, 2013 WL 1213061, at *6 (D. Mass. Mar. 22, 2013) (citing O2 Micro, 521 F.3d at 1361) (collecting cases).  While the term may admittedly be dense, the plain and ordinary meaning of the words comprising the term, when read together in the context of claim 1, do not require construction.  Id.; see Acumed LLC v. Stryker Corp., 483 F.3d 800, 806 (Fed. Cir. 2007) (noting that "a sound claim construction need not always purge every shred of ambiguity").

2.      *"identify a common point-in-time image between the first set of point-in-time images and the second set of point-in-time images"*

| Term | Actifio's Proposed Construction | Delphix's Proposed Construction |
|---|---|---|
| identify a common point-in-time image between the first set of point-in-time images and the second set of point-in-time images | No construction necessary; plain and ordinary meaning | finding from two or more point-in-time copies of application data in the destination storage pool and in the source storage pool one that exists in both storage pools |

Delphix urges the Court to construe a term in claim 5 of the '769 patent—addressing a portion of the process in which a backup operation is performed, '769 patent, 35:21-23—for substantially the same reasons as claim 1.  D. 98 at 21.  Here, Delphix focuses on the word "common" as rendering the term ambiguous and confusing, requiring construction.  Id. Specifically, Delphix's construction seeks to clarify a "common" point-in-time image to mean one that exists in both the "destination" and "source" storage pools.  Id.  However, such a construction is unnecessary.  The plain and ordinary meaning of "common" in relation to point-in-time images, read in the context of claim 5, is understood as a point-in-time image existing in both sets of point-in-time images.  See '769 patent, 35:1-23.  Delphix's construction is also not warranted where destination and source storage pools are explicitly used elsewhere in the claims, but omitted in the disputed term and in claim 5 as a whole.  Here, a "set of point-in-time images" cannot be limited to mean, as Delphix suggests, "point-in-time copies . . . in the [destination/source] storage pools."  See Thorner, 669 F.3d at 1367-68 (recognizing that a "patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning").  As to Delphix's proposed construction of "identifying" as "finding," the Court has already rejected the same argument as to another claim, discussed above, and it is no more persuasive as to this claim.  Accordingly, the Court rejects Delphix's proposed construction as to this term.

### C.    '126 Patent

1.    *"performed sequentially at a first time"*

| Term | Actifio's Proposed Construction | Delphix's Proposed Construction |
|---|---|---|
| performed sequentially at a first time | No construction necessary; plain and ordinary meaning | performed one after another at a particular time |

The disputed term appears in a portion of claim 1 in the '126 patent describing the coordination of "data management functions" (the storage of data to different locations at different times) to reduce repeated access to the data being stored. '126 patent, 33:53-58, 34:11-15. While conceding that the disputed term initially "appears easily understandably at first glance," Delphix argues that the term requires construction because the phrase "at a first time" in the term otherwise renders the plain and ordinary meaning of "performed sequentially" ambiguous and confusing. See D. 98 at 24; D. 101 at 14.

While the phrase "at *a* first time" may seem odd in isolation, "at *the* first time" is subsequently used throughout claim 1,'126 patent, 34:15-33 (emphasis added), and gives context to the disputed term. When read together with the entire claim and specification, "at *a* first time" refers to a particular time for the first and second data management functions to be performed sequentially, and "at *the* first time" refers back to that time as each of the functions are performed. That is, the second data management function ends up being dependent on the first data management function such that they are performed sequentially. For example, as discussed by Delphix, when two data management functions end up overlapping and require storage of the same primary data at the same particular time, the first data management function stores the data to secondary storage to satisfy the function "at the first time," and the second data management function—to store the same primary data to backup storage—compares the data stored in secondary storage to a previous copy in backup storage and only stores the differences to satisfy

15

the second function at that same "first time." See D. 98 at 23; '126 patent, 34:11-33.   This

process is designed so that "the primary storage is accessed only once for satisfying the first data

management function and the second data management function to be performed sequentially *at

the first time*." '126 patent, 34:30-33 (emphasis added).   Accordingly, the plain and ordinary

meaning of the term controls.

**VI.      Conclusion**

      For the foregoing reasons, the disputed claim terms are construed as follows:

1.  the term "non-lossy encoding technique" means "algorithm to create an encoded
    representation of data that allows the original data to be completely reconstructed
    from the encoded data;"

2.  the term "encoded value" means "the result of applying the non-lossy encoding
    technique to the received content;"

3.  the term "identifying the existence of a prior point-in-time image of the application
    data in a second set of a plurality of point-in-time images simultaneously stored at the
    destination storage pool for a time state prior to the specified restore time-state" does
    not require construction;

4.  the term "identify a common point-in-time image between the first set of point-in-
    time images and the second set of point-in-time images" does not require
    construction, and;

5.  the term "performed sequentially at a first time" does not require construction.

**So Ordered.**

                                 /s/ Denise J. Casper
                                 United States District Judge